**UNITED STATES of America, Appellant,**

v.

**Lui KIN–HONG, a/k/a Jerry Lui, Appellee.**

No. 97–1084.

United States Court of Appeals, First Circuit.

Heard March 5, 1997.

Decided March 20, 1997.

Order Denying Rehearing En Banc April 10, 1997.

Alex Whiting, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, Susan Hanson–Philbrick, Assistant United States Attorney, and Michael Surgalla, United States Department of Justice, Office of International Affairs, were on brief, for the United States.

Andrew Good, with whom Harvey A. Silverglate and Silverglate & Good were on brief, for appellee.

Michael Posner and John Reinstein on brief for Lawyer's Committee for Human Rights and American Civil Liberties Union of Massachusetts, amici curiae in support of appellee.

Before BOUDIN, Circuit Judge, ALDRICH, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

The United States District Court granted a writ of habeas corpus to Lui Kin–Hong ("Lui"), who sought the writ after a magistrate judge certified to the Secretary of State that she may, in her discretion, surrender Lui for extradition to the Crown Colony of Hong Kong. The United Kingdom, on behalf of Hong Kong, had sought Lui's extradition on a warrant for his arrest for the crime of bribery. Lui's petition for habeas corpus was premised on the fact that the reversion of Hong Kong to the People's Republic of China will take place on July 1, 1997, and it will be impossible for the Crown Colony to try and to punish Lui before that date. The United States appeals. We reverse the order of the district court granting the writ of habeas corpus.

The United States argues that Lui is within the literal terms of the extradition treaties between the United States and the United Kingdom, that the courts may not vary from the language of the treaties, and that the certification must issue. Lui argues that the language of the treaties does not permit extradition, an argument which is surely wrong. Lui's more serious argument is that the Senate, in approving the treaties, did not mean to permit extradition of someone to be tried and punished by a government different from the government which has given its assurances in the treaties.

■ Lui does not claim that he faces prosecution in Hong Kong on account of his race, religion, nationality, or political opinion. He does not claim to be charged with a political offense. The treaties give the courts a greater role when such considerations are present. Here, Lui's posture is that of one charged with an ordinary crime. His claim is that to surrender him now to Hong Kong is, in effect, to send him to trial and punishment in the People's Republic of China. The Senate, in approving the treaties, could not have intended such a result, he argues, and so the court should interpret the treaties as being inapplicable to his case. Absent a treaty permitting extradition, he argues, he may not be extradited.

While Lui's argument is not frivolous, neither is it persuasive. The Senate was well aware of the reversion when it approved a supplementary treaty with the United Kingdom in 1986. The Senate could easily have sought language to address the reversion of Hong Kong if it were concerned, but did not do so. The President has recently executed a new treaty with the incoming government of Hong Kong, containing the same guarantees that Lui points to in the earlier treaties, and that treaty has been submitted to the Senate. In addition, governments of our treaty partners often change, sometimes by ballot, sometimes by revolution or other means, and the possibility or even certainty of such change does not itself excuse compliance with the terms of the agreement embodied in the treaties between the countries. Treaties contain reciprocal benefits and obligations. The United States benefits from the treaties at issue and, under their terms, may seek extradition to the date of reversion of those it wants for criminal offenses.

Fundamental principles in our American democracy limit the role of courts in certain matters, out of deference to the powers allocated by the Constitution to the President and to the Senate, particularly in the conduct of foreign relations. Those separation of powers principles, well rehearsed in extradition law, preclude us from rewriting the treaties which the President and the Senate have approved. The plain language of the treaties does not support Lui. Under the treaties as written, the courts may not, on the basis of the reversion, avoid certifying to the Secretary of State that Lui may be extradited. The decision whether to surrender Lui, in light of his arguments, is for the Secretary of State to make.

This is not to say American courts acting under the writ of habeas corpus, itself guaranteed in the Constitution, have no independent role. There is the ultimate safeguard that extradition proceedings before United States courts comport with the Due Process Clause of the Constitution. On the facts of this case, there is nothing presenting a serious constitutional issue of denial of due process. Some future case may, on facts amounting to a violation of constitutional guarantees, warrant judicial intervention. This case does not.

## I.

We repeat the facts essentially as we stated them in our earlier opinion. *United States v. Lui Kin–Hong,* 83 F.3d 523 (1st Cir.1996) (reversing district court's decision to release Lui on bail).

Lui is charged in Hong Kong with conspiring to receive and receiving over U.S. $3 million in bribes from Giant Island Ltd. ("GIL") or GIL's subsidiary, Wing Wah Company ("WWC"). Lui, formerly a senior officer of the Brown & Williamson Co., was "seconded" in 1990 to its affiliated company, the British American Tobacco Co. (Hong Kong) Ltd. ("BAT–HK"), where he became Director of Exports in 1992. The charges result from an investigation by the Hong Kong Independent Commission Against Corruption ("ICAC"). The Hong Kong authorities charge that GIL and WWC, to which BAT–HK distributed cigarettes, paid bribes in excess of HK $100 million (approximately U.S. $14 to $15 million) to a series of BAT–HK executives, including Lui. The bribes were allegedly given in exchange for a virtual monopoly on the export of certain brands of cigarettes to the People's Republic of China ("PRC") and to Taiwan. Among the cigarettes distributed were the popular Brown & Williamson brands of Kent, Viceroy, and Lucky Strike. GIL purchased three-quarters of a billion dollars in cigarettes from 1991 to 1994, mostly from BAT–HK.

A former GIL shareholder, Chui To–Yan ("Chui"), cooperated with the authorities and, it is said, would have provided evidence of Lui's acceptance of bribes. Some of Lui's alleged co-conspirators attempted to dissuade Chui from cooperating. Chui was later abducted, tortured, and murdered. The ICAC claims that the murder was committed to stop Chui from testifying. Lui is not charged in the murder conspiracy. Lui was in the Philippines (which has no extradition treaty with Hong Kong) on a business trip when the Hong Kong authorities unsuccessfully sought to question him in April 1994.

Lui has not returned to Hong Kong since then.

At the request of the United Kingdom ("UK"), acting on behalf of Hong Kong, United States marshals arrested Lui as he got off a plane at Boston's Logan Airport on December 20, 1995. The arrest was for the purpose of extraditing Lui to Hong Kong.[1] The government asked that Lui be detained pending completion of the extradition proceedings. The magistrate judge, after a hearing, denied Lui's request to be released on bail.

The district court, on April 25, 1996, reversed the order of the magistrate judge and released Lui on bail and conditions. *Lui Kin–Hong v. United States,* 926 F.Supp. 1180 (D.Mass.1996). The district court held that the reversion of Hong Kong to the PRC on July 1, 1997, raised complex legal issues that would result in protracted proceedings and presented a "special circumstance" overriding the presumption against bail. *Id.* at 1189. That court also found that there were conditions of release that would adequately ensure Lui's presence at future proceedings. *Id.* at 1196. This court reversed the district court and, on May 14, 1996, ordered Lui held pending the resolution of the extradition certification issue. *Lui,* 83 F.3d at 525.

The magistrate judge commenced extradition hearings on May 28, 1996. Those proceedings, during which evidence was taken, lasted three days. The magistrate judge found that there was probable cause to believe that Lui had violated Hong Kong law on all but one of the charges in the warrant.[2] Magistrate Judge Karol, pursuant to 18 U.S.C. § 3184, issued a careful decision certifying Lui's extraditability on August 29, 1996. *In re Extradition of Lui Kin–Hong ("Lui Extradition "),* 939 F.Supp. 934 (D.Mass. 1996). On September 3, 1996, Lui filed an amended petition for a writ of habeas corpus, the only avenue by which a fugitive sought for extradition (a "relator") may attack the

---

1. The most recent warrant for Lui's arrest from the Hong Kong authorities is dated February 5, 1996; there were earlier warrants.

2. The magistrate judge found the government had not met its burden of showing probable cause as to Count 2, concerning a payment of HK $1,953,260 made on or about October 21, 1988.

magistrate judge's decision,[3] with the district court.

After a hearing, the district court issued a memorandum and order granting the writ on January 7, 1997. *Lui Kin–Hong v. United States ("Lui Habeas"),* 957 F.Supp. 1280, (D.Mass.1997). The district court reasoned that, because the Crown Colony could not try Lui and punish him before the reversion date, the extradition treaty between the United States and the UK, which is applicable to Hong Kong, prohibited extradition. *Id.* at 1285–86. Because no extradition treaty between the United States and the new government of Hong Kong has been confirmed by the United States Senate, the district court reasoned, the magistrate judge lacked jurisdiction to certify extraditability. *See id.* at 1286–92. The district court denied the government's motion for reconsideration on January 13, 1997. This court then stayed the district court's order and expedited the present appeal.

At the time Lui was arrested in Boston in December 1995, more than eighteen months remained before the reversion of Hong Kong to the PRC on July 1, 1997. The various proceedings in our court system have now occupied fifteen of those months, as the magistrate judge and district judge have given careful consideration to the issues.

## II.

The extradition request was made pursuant to the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 8, 1972, 28 U.S.T. 227 (the "Treaty"), as amended by the Supplementary Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 25, 1985, T.I.A.S. No. 12050 (the "Supplementary Treaty").[4] The original Treaty was made applicable to Hong Kong, among other British territories, by an exchange of diplomatic notes on October 21, 1976. 28 U.S.T. at 238–41.[5] The Supplementary Treaty is applicable to Hong Kong by its terms. Supplementary Treaty, art. 6(a) & Annex.

Hong Kong's status as a Crown Colony is coming to an end on July 1, 1997, when Hong Kong is to be restored to the PRC. The impending reversion, at the expiration of the UK's ninety-nine year leasehold, was formally agreed upon by the UK and the PRC in 1984; the United States was not a party to this agreement. *See* Joint Declaration of the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the People's Republic of China on the Question of Hong Kong, Dec. 19, 1984, ratified and entered into force May 27, 1985, T.S. No. 26 (1985) (the "Joint Declaration"). Under the terms of the Joint Declaration, the PRC "declares" its "basic policies" with respect to Hong Kong. *Id.* art. 3. The PRC states that it intends to establish a "Hong Kong Special Administrative Region" ("HKSAR"), *id.* art. 3(1), which will enjoy a "high degree of autonomy except in foreign and defence affairs." *Id.* art. 3(2). In addition, the PRC states that the HKSAR "will be vested with ... independent judicial power, including that of final adjudication" and that the "laws currently in force in Hong Kong will remain basically unchanged." *Id.* art. 3(3). These "basic policies" are, accord-

---

**3.** Due to the limited function of an extradition proceeding, there is no direct appeal from a judicial officer's certification of extraditability. *See Collins v. Miller,* 252 U.S. 364, 369–70, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920). A habeas petition is therefore the only mechanism by which a relator may seek review.

**4.** We refer to the Treaty and the Supplementary Treaty as "the Treaties."

**5.** By its terms, the Treaty applies to the UK, and, in addition, to "any territory for the international relations of which the United Kingdom is responsible and to which the Treaty shall have been extended by agreement between the Contracting Parties embodied in an Exchange of Notes." Treaty, art. II(1)(a).

The Treaty permits either the UK or the United States, upon six months written notice, to terminate the application of the Treaty as to any territory to which the Treaty was extended under article II(1)(a). *Id.* art II(2). To date, to our knowledge, neither party has attempted to invoke this provision to terminate the application of the Treaty to Hong Kong.

ing to the Joint Declaration, to "remain unchanged for 50 years." *Id.* art. 3(12).

United States Senate ratification of the Supplementary Treaty occurred on July 17, 1986, well after the widely publicized signing of the Joint Declaration. *See* 132 Cong.Rec. 16,819 (1986). Clearly, the Senate was aware of the planned reversion when it approved the applicability to Hong Kong of the Supplementary Treaty.[6] The Supplementary Treaty does not contain an exception for relators who can show that their trial or punishment will occur after the date of reversion. Indeed, the Supplementary Treaty is entirely silent on the question of reversion.

The United States does not have an extradition treaty with the PRC. However, on December 20, 1996, the United States signed an extradition treaty with the government of the nascent HKSAR, which provides for reciprocal post-reversion extradition. *See* Agreement Between the Government of the United States of America and the Government of Hong Kong for the Surrender of Fugitive Offenders, Dec. 20, 1996 (the "New Treaty"). The New Treaty will not enter into force until the Senate gives its advice and consent. It was submitted to the Senate on March 3, 1997. *See* 143 Cong.Rec. S1846 (daily ed. Mar. 3, 1997).

### A. *United States Extradition Procedure*

In the United States, the procedures for extradition are governed by statute. *See* 18 U.S.C. ch. 209. The statute establishes a two-step procedure which divides responsibility for extradition between a judicial officer [7] and the Secretary of State. The judicial officer's duties are set out in 18 U.S.C. § 3184. In brief, the judicial officer, upon

---

6. *See, e.g.,* 132 Cong.Rec. 16,598 (1986) (statement of Sen. Hatch) (commenting on applicability of Supplementary Treaty to Hong Kong).

7. The judicial officer may be any federal judge, any authorized magistrate, or any state judge of a court of general jurisdiction. *See id.* § 3184.

8. While not required to by statute, the Department of State routinely accepts written submissions from relators in conjunction with its review of extraditability. 4 Abbell & Ristau, *International Judicial Assistance: Criminal—Extradition,* § 13–3–8(5), at 274 (1995).

complaint, issues an arrest warrant for an individual sought for extradition, provided that there is an extradition treaty between the United States and the relevant foreign government and that the crime charged is covered by the treaty. *See id.* If a warrant issues, the judicial officer then conducts a hearing to determine if "he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty." *Id.* If the judicial officer makes such a determination, he "*shall* certify" to the Secretary of State that a warrant for the surrender of the relator "*may* issue." *Id.* (emphases added). The judicial officer is also directed to provide the Secretary of State with a copy of the testimony and evidence from the extradition hearing. *Id.*

It is then within the Secretary of State's sole discretion to determine whether or not the relator should actually be extradited. *See* 18 U.S.C. § 3186 ("The Secretary of State *may* order the person committed under section[ ] 3184 ... of this title to be delivered to any authorized agent of such foreign government ...." ) (emphasis added). The Secretary has the authority to review the judicial officer's findings of fact and conclusions of law *de novo,*[8] and to reverse the judicial officer's certification of extraditability if she believes that it was made erroneously.[9] *See* 4 Abbell & Ristau, *International Judicial Assistance: Criminal—Extradition* § 13–3–8(2), at 266–69 (1995); Note, *Executive Discretion in Extradition,* 62 Colum.L.Rev. 1313, 1316–25 (1962). The Secretary may also decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations. *See* 4 Abbell & Ristau, *supra,* § 13–3–8(3), at 269–73; II Bassiouni,

---

9. Although at first glance, this procedure might appear to be of questionable constitutionality because it subjects judicial decisions to executive review, rendering them non-final, *cf. Hayburn's Case,* 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792), it has been held that the judicial officer in an extradition proceeding "is not exercising 'any part of the judicial power of the United States,'" and instead is acting in "a non-institutional capacity." *United States v. Howard,* 996 F.2d 1320, 1325 (1st Cir.1993) (quoting *In re Kaine,* 55 U.S. (14 How.) 103, 120, 14 L.Ed. 345 (1852)).

*International Extradition: United States Law and Practice* 601–04 (1987). Additionally, the Secretary may attach conditions to the surrender of the relator. *See Jimenez v. United States District Court,* 84 S.Ct. 14, 19, 11 L.Ed.2d 30 (1963) (Goldberg, J., chambers opinion) (denial of stay) (describing commitments made by Venezuelan government to United States Department of State as a condition of surrender of fugitive); 4 Abbell & Ristau, *supra,* § 13–3–8(4), at 273–74; II Bassiouni, *supra,* at 604.[10] The State Department alone, and not the judiciary, has the power to attach conditions to an order of extradition. *See, e.g., Emami v. United States District Court,* 834 F.2d 1444, 1453 (9th Cir.1987); *Demjanjuk v. Petrovsky,* 776 F.2d 571, 584 (6th Cir.1985), vacated on other grounds, 10 F.3d 338 (6th Cir.1993). Of course, the Secretary may also elect to use diplomatic methods to obtain fair treatment for the relator. *See,* Note, *supra,* at 1325–26; *cf. In re Normano,* 7 F.Supp. 329, 329 (D.Mass.1934).

 Thus, under 18 U.S.C. § 3184, the judicial officer's inquiry is limited to a narrow set of issues concerning the existence of a treaty, the offense charged, and the quantum of evidence offered. The larger assessment of extradition and its consequences is committed to the Secretary of State. This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch. Both institutional competence rationales and our constitutional structure, which places primary responsibility for foreign affairs in the executive branch, *see, e.g., United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 319–22, 57 S.Ct. 216, 220–22, 81 L.Ed. 255 (1936), support this division of labor.

 In implementing this system of split responsibilities for extradition, courts have developed principles which ensure, among other things, that the judicial inquiry does not unnecessarily impinge upon executive prerogative and expertise. For example, the executive branch's construction of a treaty, although not binding upon the courts, is entitled to great weight. *Factor v. Laubenheimer,* 290 U.S. 276, 295, 54 S.Ct. 191, 196, 78 L.Ed. 315 (1933); *cf. United States v. Howard,* 996 F.2d 1320, 1330 n. 6 (1st Cir. 1993) (deference to executive in extradition context stems, at least in part, from fact that executive wrote and negotiated operative documents). Another principle is that extradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement because they are "in the interest of justice and friendly international relationships." *Factor,* 290 U.S. at 298, 54 S.Ct. at 197. These principles of construction require courts to:

> interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories: "[Treaties] should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason, if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."

*Howard,* 996 F.2d at 1330–31 (quoting *Factor,* 290 U.S. at 293–94, 54 S.Ct. at 195–96).

 Another principle that guides courts in matters concerning extradition is the rule of non-inquiry. More than just a principle of treaty construction, the rule of non-inquiry tightly limits the appropriate scope of judicial analysis in an extradition proceeding. Under the rule of non-inquiry, courts refrain from "investigating the fairness of a requesting nation's justice system," *id.* at 1329, and from inquiring "into the procedures or treatment which await a surrendered fugitive in the requesting country." *Arnbjornsdottir–Mendler v. United States,* 721 F.2d 679, 683 (9th Cir.1983). The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers. *See United States v. Smyth,*

---

10. The United States has, for example, imposed conditions as to the type of trial the relator would receive (*e.g.,* in civil, rather than martial law, court) and as to security arrangements for the relator. 4 Abbell & Ristau, *supra,* § 13–3–8(4), at 273 n.1.

61 F.3d 711, 714 (9th Cir.1995).[11] It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.[12]

Lui contends that, on July 1, 1997, the reversion of Hong Kong to the PRC will result in his being subjected to trial and punishment by a regime with which the United States has no extradition treaty. This future event, Lui argues, operates retroactively to render his extradition illegal, *as of today*, because, he says, extradition is only legitimate where trial and punishment will be administered by the regime with which the United States has a treaty.

Although Lui is correct that the government has conceded that he will not be tried before reversion, it is also quite possible that the scenario he depicts will not arise. The new extradition treaty with the HKSAR may be approved by the United States Senate, establishing a continuity of treaties through and beyond July 1, 1997.[13] The United States government may choose to extend the current Treaty by executive agreement.[14] To the extent that Lui's argument depends on the fairness of the procedures he will be subjected to, he asks this court to decide that the PRC will not adhere to the Joint Declaration with the UK, in which it declared its intention to maintain Hong Kong's legal system for fifty years.

All of these questions involve an evaluation of contingent political events. The Supreme Court has said that the indicia of a non-justiciable political question include:

a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate

11. One commentator has analogized the rule of non-inquiry to the "act of state" doctrine, which prohibits United States courts from judging the governmental acts of a foreign country performed within its own territory. *See* Semmelman, *Federal Courts, The Constitution, and The Rule of Non–Inquiry in International Extradition Proceedings*, 76 Cornell L.Rev. 1198 (1991). The "act of state" doctrine, the Supreme Court has said, "arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423, 84 S.Ct. 923, 938, 11 L.Ed.2d 804 (1964). This court has doubted, in dicta, that the rule of non-inquiry is constitutionally mandated. *Howard*, 996 F.2d at 1330 n. 6. Whether the doctrine is constitutionally mandated is immaterial here.

12. Nor is it true, as Lui suggests, that the rule of non-inquiry is only appropriate where the existence of a treaty reflects a substantive judgment about the fairness of another nation's procedures. The United States has maintained, over time, extradition treaties with some of the world's most oppressive and arbitrary regimes. *See* 18 U.S.C. § 3181 (listing treaties of extradition and dates entered into). The rule of non-inquiry expresses *no* judgment about a foreign nation's ability and willingness to provide justice; it simply defers that assessment to the second part of every extradition proceeding—review of extraditability and determination of the appropriateness of surrender by the Secretary of State. Indeed, a leading commentator, in discussing the scope of the Secretary's discretion under 18 U.S.C. § 3186, has argued that it is precisely *"because of* the rule of non-inquiry" that it is appropriate for the Secretary to exercise discretion on humanitarian grounds. II Bassiouni, *supra*, at 602 (emphasis added).

13. The government does not argue that, absent any other action and of their own accord, the Treaties would continue beyond reversion to apply to Hong Kong. Accordingly, on the facts of this case, we find the discussion of the state succession doctrine in *Terlinden v. Ames*, 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534 (1902), a case heavily relied upon by the district court, *see Lui Habeas*, 957 F.Supp. at 1285–86, to be of little assistance to Lui. Of course, the discussion in *Terlinden* of the rule of non-inquiry is relevant, and supports our analysis.

14. It may be argued that this alternative infringes upon the Senate's prerogative, under the Treaty Clause, U.S.Const., art. II, § 2, to give its advice and consent. But it is hardly an appropriate judicial task to attempt to resolve a hypothetical and not ripe dispute between the legislature and the executive.

branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). While not all of these ingredients are present here, several are. Moreover, unlike many "political questions," whose resolution, absent judicial determination, must await the vagaries of the political process, here there is a statutory scheme which provides for the resolution of these questions by an identified member of the executive branch. The case for judicial resolution is thus weaker than with many such questions.

The principles of reciprocity and liberal construction also counsel against construing the Treaties so as to prohibit Lui's extradition. Hong Kong, through the United Kingdom, has entered bilateral treaties with the United States. The United States has sought extradition of criminals from Hong Kong in the past, and may wish to continue to do so up until July 1, 1997. If the executive chooses to modify or abrogate the terms of the Treaties that it negotiated, it has ample discretion to do so. However, if this court were to read a cut-off date vis-a-vis extraditions to Hong Kong into the Treaties, it would risk depriving both parties of the benefit of their bargain.

None of these principles, including noninquiry, may be regarded as an absolute. We, like the Second Circuit, "can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle[s]" discussed above. *Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir.1960). This is not such a case. Lui is wanted for economic, not political, activities whose criminality is fully recognized in the United States. His extradition is sought by the *current* Hong Kong regime, a colony of Great Britain, which, as Lui himself points out, is one of this country's most trusted treaty partners. Moreover, Lui has been a fugitive from Hong Kong since 1994. He has been subject to extradition since entering the United States in December 1995. That now only a few months remain before the reversion of Hong Kong is partly attributable to strategic choices made by Lui himself. There is nothing here which shocks the conscience of this court.

### B. *The Treaties*

There is no dispute that the Treaty, as supplemented by the Supplementary Treaty, is currently in effect and is applicable to Hong Kong. The district court, in granting Lui's habeas petition, reasoned that "the Treaty, by its own terms, does not allow the extradition of a person to Hong Kong if the Crown Colony of Hong Kong is unable to try and to punish that person." *Lui Habeas,* 957 F.Supp. at 1286. The government counters that the terms of the Treaty clearly allow Lui's extradition. There is nothing in the plain language of the Treaties that would permit the construction made by the district court. The principles discussed above argue persuasively against reading judicially created limitations into the Treaties' unambiguous text.

### 1. *Overview*

We begin our analysis of the Treaties with a brief overview of the Treaties' operative provisions. Article I of the Treaty states the basic reciprocal compact, providing that:

> Each Contracting Party undertakes to extradite to the other, in the circumstances and subject to the conditions specified in this Treaty, any person found in its territory who has been accused or convicted of any offense within Article III, committed within the jurisdiction of the other Party.

Treaty, art. I.

Article III contains the "dual criminality" requirement, a requirement that is "central to extradition law and [one that] has been embodied either explicitly or implicitly in all prior extradition treaties between the United States and Great Britain." *Brauch v. Raiche,* 618 F.2d 843, 847 (1st Cir.1980). Article III, in relevant part, provides that:

> Extradition shall be granted for an act or omission the facts of which disclose an

offense within any of the descriptions listed in the Schedule annexed to this Treaty ... or any other offense, if: (a) the offense is punishable under the laws of both Parties by imprisonment or other form of detention for more than one year or by the death penalty....

Treaty, art. III(1). The annexed Schedule lists twenty-nine general crimes, including bribery, the crime of which Lui is accused. *See* Treaty, Schedule, No. 23.

Article V contains various affirmative defenses, including the "political offense" exception. As a general matter, the political offense exception "is now a standard clause in almost all extradition treaties of the world." I Bassiouni, *supra*, at 384. The political offense exception in the Treaty prohibits extradition where "(i) the offense for which extradition is requested is regarded by the requested Party as one of a political character; or (ii) the person sought proves that the request for his extradition has in fact been made with a view to try or punish him for an offense of a political character." Treaty, art. V(1)(c).

The Supplementary Treaty narrows the availability of this political offense exception. It lists a range of crimes—all crimes of violence—that may not be regarded as political offenses for the purpose of raising the political offense exception. *See* Supplementary Treaty, art. 1. The Supplementary Treaty also offers an affirmative defense to fugitives sought for crimes of violence who, by virtue of its article 1, are unable to raise the political offense exception. *See* Supplementary Treaty, art. 3(a), (b). Such a fugitive may block extradition by establishing:

> by a preponderance of the evidence that the request for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality, or political opinions, or that he would, if surrendered, be prejudiced at his trial or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions.

*Id.* art. 3(a).

The procedural requisites of an extradition request are specified in article VII of the Treaty. The request must be accompanied by, *inter alia*, a description of the fugitive, a statement of facts of the offense, and the text of the law under which he is charged. *See* Treaty, art. VII(2). For accused (as opposed to already convicted) fugitives, the request must also include a valid arrest warrant and "such evidence as, according to the law of the requested Party, would justify his committal for trial if the offense had been committed in the territory of the requested Party, including evidence that the person requested is the person to whom the warrant of arrest refers." *Id.* art. VII(3).[15]

Article XII contains the "specialty" requirement, a common feature of extradition treaties. Specialty has two basic components. First, the requesting state may not try the fugitive for any crimes other than the specific crime for which extradition was sought and granted. Second, the requesting state may not re-extradite the fugitive to a third state. *See* Treaty, art. XII.

### 2. *Analysis*

Both the district court and Lui focus on four Treaty provisions in concluding that the Treaty is inapplicable to Lui. *See Lui Habeas*, 957 F.Supp. at 1286–89. We address these provisions in turn, concluding that the obligation of the United States to extradite Lui, specified in article I of the Treaty, is not undermined by any of these provisions. We base our analysis on the plain language of the Treaty. *United States v. Alvarez–Machain*, 504 U.S. 655, 663, 112 S.Ct. 2188, 2193, 119 L.Ed.2d 441 (1992); · *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982). Underlying this analysis is the court's awareness of the limited role of the judiciary in extradition proceedings.

### *The Warrant Requirement*

 The district court understood the warrant requirement of article VII(3) to serve the purpose of permitting "the request-

---

**15.** Article IX(1), in turn, states that extradition shall not be granted if the evidentiary showing required by article VII(3) is not made by the requesting party.

**114**

ed sovereign to know that the relator has been accused ... pursuant to the laws of the requesting sovereign, and that he will be tried and punished in accordance with that sovereign's laws." *Lui Habeas,* 957 F.Supp. at 1287. In this case, the district court reasoned, since Lui would not be tried in accordance with the present Hong Kong regime's laws, the warrant requirement was not met. *Id.*

■ There is nothing in the language of article VII(3), or the rest of article VII, which indicates that the warrant requirement serves the greater function attributed to it by the district court. Indeed, the warrant requirement appears to do nothing more than to help the judicial officer in the requested country to confirm that there are in fact charges properly pending against the relator in the requested country, and that the relator is actually the person sought. It does not authorize the investigation which the district court envisioned, and indeed such an investigation is foreclosed by the rule of non-inquiry. A warrant was provided by the Hong Kong authorities here, and Lui does not attack its validity or authenticity. The warrant requirement was plainly satisfied.

*The Dual Criminality Requirement*

■ The district court understood the purpose of the dual criminality requirement, as stated in article III of the Treaty, to be "to provide the requested sovereign with the opportunity to examine the substantive law of the requesting sovereign in the context of the Treaty." *Lui Habeas,* 957 F.Supp. at 1287. The court stated that the requirement serves to "underscore[ ] the expectation running through the Treaty that [Lui] is to be tried, judged, and punished in accordance with the laws of the requesting sovereign." *Id.*

■ There is nothing in the text of article III of the Treaty that supports this sweeping conclusion. The dual criminality requirement, by its plain terms, is satisfied if the crime of which the relator is accused appears on the annexed Schedule or is punishable in both countries by at least one year's imprisonment. Bribery, as noted above, appears on the annexed Schedule.

■ The purpose of the dual criminality requirement is simply to ensure that extradition is granted only for crimes that are regarded as serious in both countries. *See United States v. Saccoccia,* 58 F.3d 754, 766 (1st Cir.1995) ("The principle of dual criminality dictates that, as a general rule, an extraditable offense must be a serious crime (rather than a mere peccadillo) punishable under the criminal laws of both the surrendering and the requesting state."), *cert. denied,* —— U.S. ——, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996); *Restatement (Third) of the Foreign Relations Law of the United States* § 476, cmt. d (1987); *id.* § 475, cmt. c.

The dual criminality requirement is satisfied here.

*The Political Offense Exception*

■ The district court also relied on article 3(a) of the Supplementary Treaty, which, it stated, requires the judicial officer "to examine the reasons for the requesting sovereign's desire to try and to punish the relator." *Lui Habeas,* 957 F.Supp. at 1287. In this case, stated the district court, article 3(a) "underscores again the Treaty's requirement and expectation that extradition ... may not take place if the requesting sovereign ... is unable to try and punish Lui in the relatively few days left before its reversion to China." *Id.*

The Supplementary Treaty article 3(a) defense is simply inapplicable here. Supplementary Treaty article 3(a) describes a defense which is available only to fugitives charged with one of the crimes specified in article 1 of the Supplementary Treaty, all of which are crimes of violence. Lui's alleged crime—bribery—is not among the crimes enumerated in the Supplementary Treaty's article 1.

Indeed, the very purpose of the Supplementary Treaty was to cabin the political offense exception so that perpetrators of certain violent offenses would be precluded from avoiding extradition simply because their criminal activity was inspired by political motivation. *See Howard,* 996 F.2d at 1324–25. Because this contraction of the time-honored political offense exception stirred up a great deal of controversy during negotiations, a

compromise position was ultimately agreed upon, so that fugitives barred from invoking the political offense defense might still claim the protection of the more limited defense of article 3(a). *See id.* at 1324 (discussing negotiating history and legislative history).

Lui properly does not claim that he is entitled to the article V(1)(c) political offense exception.[16] The Supplementary Treaty article 3(a) defense was unavailable to him, and thus, however much article 3(a) might ever, as the district court stated, "require[ ] the court to examine the reasons for the requesting sovereign's desire to try and to punish the relator," *Lui Habeas*, 957 F.Supp. at 1287, it certainly does not do so here.

Moreover, article 3(a) allows the judicial officer to make only a narrowly circumscribed inquiry. "[A]n extradition target must establish by a preponderance of the evidence that, if he were surrendered, the legal system of the requesting country would treat him differently from other similarly situated individuals because of his race, religion, nationality, or political opinions." *Howard*, 996 F.2d at 1331. Lui made no such showing of discrimination, and the district court, in making its own predictions about the post-reversion justice system in Hong Kong, exceeded the narrow inquiry permitted by article 3(a).

### The Rule of Specialty

The district court understood the Treaty's specialty provision to signify that "the Treaty allows only for extradition for offenses that can be tried and punished by the requesting sovereign." *Lui Habeas*, 957 F.Supp. at 1288. Because the specialty obligation cannot be enforced by the United States after reversion, reasoned the district court, article XII is violated *ab initio*, and Lui cannot be extradited. *Id.* at 1288–89.

The rule of specialty literally has no application here. The rule has two basic requirements: that the relator be tried for the crimes charged in the extradition warrant and that the relator not be re-extradited to another country. There is no claim that either of these is violated. Indeed, as the district court properly recognized, Lui is not arguing that the reversion itself would constitute a de facto re-extradition from Hong Kong to China in violation of the specialty provision. *Lui Habeas*, 957 F.Supp. at 1288 n. 15; *see also Oen Yin–Choy v. Robinson*, 858 F.2d 1400, 1403–04 (9th Cir.1988).

The essence of Lui's argument is rather different: it is that the fact that he cannot be tried and punished by the same government which gave the Treaty assurances contravenes the rationale behind the specialty provisions and so undermines confidence that this is the result the Senate intended in giving its consent. The responses to that argument are largely those outlined at the beginning of this opinion. We add only our thoughts directed to the specialty clause itself.

If Lui's position were correct, the enforceability of many extradition treaties to which the United States is a party would be thrown into grave doubt. Regimes come and go, as, indeed, do states. Moreover, 18 U.S.C. § 3184, which defines the role of the courts in the extradition process, gives no discretion to the judicial officer to refuse to certify extraditability on the ground that a treaty partner cannot assure the requested country that rights under a treaty will be enforced or protected. *See Saccoccia*, 58 F.3d at 766–67.

The Ninth Circuit, writing in 1988, also rejected a similar argument made by a fugitive who fought extradition by arguing that the United States would be unable to compel Hong Kong's compliance with the specialty obligation because, although he would face trial in the Crown Colony, his imprisonment might extend past the reversion date. "Were the Treaty to be interpreted as [the fugitive] asks, extradition to Hong Kong would be the exception rather than the rule because it would be limited in practice only

---

16. Even if he had attempted to assert the political offense exception, he would likely have been unsuccessful since "[c]riminal conduct in the nature of financial fraud ... traditionally has been

considered outside the 'political offense' exception." *Koskotas v. Roche*, 931 F.2d 169, 172 (1st Cir.1991) (citing cases).

to extraditions for crimes which could be punished for a term expiring before the reversion date." *Oen Yin–Choy*, 858 F.2d at 1404. Indeed, if we interpreted the specialty provision in this way, we would be forced to conclude that any relator extradited from the United States to Hong Kong at any point since the signing of the Joint Declaration, was, if he faced a term of imprisonment upon conviction that could conceivably extend past the date of reversion, sent to Hong Kong in violation of the Treaty.

■ Of course, Lui may express his concerns about the post-reversion enforceability of specialty to the Secretary of State, who, in her discretion, may choose not to surrender him. We note that the newly signed, as yet unratified, extradition treaty between the United States and the HKSAR provides that specialty protection "shall apply to fugitive offenders who have been surrendered between the parties prior to the entry into force" of the new treaty. New Treaty, arts. 16, 20. It is not the role of the judiciary to speculate about the future ability of the United States to enforce treaty obligations.

### III.

■ Lui also challenges the determination of the magistrate judge that there was probable cause to believe that Lui had violated Hong Kong law on eight of the nine charges in the warrant. Although the district court declined to review this issue, we do reach it.

Lui protests that we lack power to reach this issue, and that we must remand to the district court for further findings. However, the issue was fully briefed and argued to the district court. The record is complete. This is a habeas corpus appeal, in which the district court was not the fact finder but had only a review function over the findings made by the magistrate judge. The function to be exercised by the district court is more akin to appellate review, and is done on the same

record as is before us. Under these circumstances, the district court had no greater institutional competence to perform this review task than do we. That the district court declined to reach the issue does not deprive us of the power to do so.

■ While it is true that, as a general matter, federal courts of appeals do not rule on issues not decided in the district court, *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976), we do have discretion to address issues not reached by the district court when the question is essentially legal and the record is complete. *Quinn v. Robinson*, 783 F.2d 776, 814 (9th Cir.1986); *cf. Howard*, 996 F.2d at 1329 ("That the district court failed to afford plenary review on this aspect of the case does not mean that we must remand. . . . Rather, because the question is quintessentially legal and this court is fully capable of deciding it without any further development of the record, we can simply address and resolve it.") (citations omitted). Such is the case here. We have before us the parties' memoranda on probable cause to the district court and the magistrate judge as well as the completed evidentiary record. In the interest of conserving judicial resources and mindful of the policy that extradition matters be handled expeditiously, we see no reason for further delay.[17] *Cf. Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925) (Supreme Court reviews probable cause determination of judge certifying extradition without intermediate court passing on the question).

■ The traditional formulation is that, on habeas corpus review of a certification of extraditability, the court only examines the magistrate judge's determination of probable cause to see if there is "any evidence" to support it. *Fernandez*, 268 U.S. at 312, 45 S.Ct. at 542; *see also Sidali v. INS*, 107 F.3d 191, 199–200 (3d Cir.1997); *Then v. Melendez*, 92 F.3d 851, 854 (9th Cir.1996). This

---

17. There is no unfairness to Lui. He has had full opportunity to address the issue of whether there is probable cause for extradition before the magistrate judge and full opportunity to address the magistrate judge's determination before the district court. In the extradition proceedings before the magistrate judge, Lui filed a 45 page memorandum on the probable cause issue accompanied by a copious appendix. He also filed motions to exclude certain of the government's evidence, called witnesses, and presented both live testimony and testimony by affidavit.

circuit has interpreted the "any evidence" standard quite literally, conducting a fairly deferential review of the magistrate's findings. *See Koskotas* v. *Roche,* 931 F.2d 169, 176 (1st Cir.1991); *United States v. Manzi,* 888 F.2d 204, 205 (1st Cir.1989); *Brauch,* 618 F.2d at 854; *Greci v. Birknes,* 527 F.2d 956 (1st Cir.1976).

Recently, some other appellate courts, while retaining the traditional formulation, have apparently engaged in a more rigorous review of the evidence presented before the judicial officer, thus raising questions about the actual content of the "any evidence" standard. *See, e.g., Sidali,* 107 F.3d at 199–200; *Ludecke v. Marshal,* 15 F.3d 496, 497–98 (5th Cir.1994); *Peters v. Egnor,* 888 F.2d 713, 717–18 (10th Cir.1989). The Supreme Court last addressed the scope of a court's authority on habeas corpus review of a finding of extraditability in 1925, when it said that "the alleged fugitive from justice has had his hearing" and that "habeas corpus is available only to inquire" into a very limited list of issues. *See Fernandez,* 268 U.S. at 312, 45 S.Ct. at 542. The existence of "any evidence warranting the finding that there was reasonable ground to believe the accused guilty" was one of only three issues that the *Fernandez* court said might permissibly be reached on habeas. *Id.* At that time, the scope of habeas corpus review of *all* proceedings was very limited, and *Fernandez* 's strictures on review in extradition proceedings, including the deferential "any evidence" standard, may simply reflect that generally narrower view of the writ. *See In re Extradition of Burt,* 737 F.2d 1477, 1484 (7th Cir.1984) ("[T]he broad language of *Fernandez,* which on its face would appear to restrict the scope of inquiry here, must be construed 'in the context of its time and in the context of subsequent development of the scope of habeas corpus review.'" (citation omitted)). Since 1925, and until the enactment of the AEDPA in 1996,[18] habeas corpus in other contexts has expanded to become a "second look" at most substantive and procedural issues. Similarly, courts reviewing certifications of extraditability, while continuing to cite *Fernandez,* have

actually engaged in review of issues beyond those enumerated by the Supreme Court in 1925. *See* Kester, *Some Myths of United States Extradition Law,* 76 Geo.L.J. 1441, 1473 (1988); *see also* 4 Abbell & Ristau, *supra,* § 13–3–6, at 255–57. Thus, it is arguable that the "any evidence" standard is an anachronism, and that this court should engage in a more searching review of the magistrate's probable cause findings.

There is no reason to predict a resolution of this issue here. Whatever the prism through which this record is reviewed, ranging from a strictly construed "any evidence" standard to *de novo* review, our conclusion is that the government has met its burden.

 The purpose of the evidentiary portion of the extradition hearing is to determine whether the United States, on behalf of the requesting government, has produced sufficient evidence to hold the person for trial. The standard of sufficiency is derived from United States law, including the Treaty between the United States and the UK. Under 18 U.S.C. § 3184, the judicial officer must determine whether the evidence of criminality is "sufficient to sustain the charge under the provisions of the proper treaty or convention." The Treaty requires that:

> Extradition shall be granted only if the evidence be found sufficient according to the law of the requested Party ... to justify the committal for trial of the person sought if the offense of which he is accused had been committed in the territory of the requested Party....

Treaty, art. IX(1). "United States courts have interpreted this provision in similar treaties as requiring a showing by the requesting party that there is probable cause to believe that the accused has committed the charged offense." *Quinn,* 783 F.2d at 783 (separate opinion of Reinhardt, J.) (citing cases). The Supplementary Treaty defines probable cause:

> Probable cause means whether there is sufficient evidence to warrant a man of reasonable caution in the belief that ... an

offense has been committed by the accused.

Supplementary Treaty, art. 2. The actual trial, if any, is in the foreign court, and it is not the purpose of the extradition hearing to determine whether the evidence is sufficient to justify conviction. Thus it is the probable cause determination which is subject to our review.

There is no dispute that payments of over HK $21 million (approximately U.S. $3 million) and unsecured loans of HK $10 million (approximately U.S. $1.4 million) were made to Lui, that the payments were made into foreign bank accounts in Lui's name, and that the payments were not made directly by check but through a series of steps which made them more difficult to trace. There is also no dispute that the payments were made on the dates charged. The timing is significant. The payments coincided with the knowledge that Lui was being considered as Director of Exports for BAT–HK and with his appointment to that position in 1992.[19] The loans were made within three days of Lui's leaving his employment at Brown & Williamson and BAT–HK. It is not contested that BAT–HK was the major supplier of cigarettes to GIL and WWC, that Brown & Williamson prohibits its employees from accepting "inducements" from those with whom it does business and requires disclosure statements to be completed, and that Lui failed to disclose any of these payments on his disclosure form. The dispute between the government and Lui is basically over the purpose of these payments.

Two competing theories explaining the purpose of the payments were presented to the magistrate judge. The government argued that the payments were bribes. Although Lui had no burden to produce any evidence at all and the burden of showing probable cause rested entirely on the government, Lui did present an explanation for the loans and payments, primarily in the affidavit

of Hung Wing Wah ("Hung"), a former GIL director and sole proprietor of GIL's subsidiary, WWC.[20] In essence, Hung said that, in or around 1987, prior to Lui's employment with Brown & Williamson, he and Lui first began discussing "cigarette business matters." Hung stated that these discussions eventually led to the establishment of a profitable business relationship in which Hung purchased Japanese cigarettes and resold them at a profit for the account of Chen Ying–Jen ("Chen"), a former GIL principal. The payments to Lui's foreign bank accounts were filtered through Chen's account.

Hung stated he was told by Chen that, because of the substantial profits generated by the business relationship Lui had been instrumental in establishing, Chen had agreed to pay Lui for his assistance and would continue paying Lui as long as the relationship continued to generate such substantial profits. Hung indicated that the sums paid to Lui bore a reasonable relationship to the magnitude of Chen's profits. And finally, Hung stated that the unsecured short term loans had been made to Lui so that Lui could invest in the then-booming Hong Kong stock market. Hung stated that both the principal and interest were repaid shortly after the loans were made. During the hearing before the magistrate judge, Lui's counsel indicated that Lui would testify, and described what that testimony would be. This description matched the testimony given by Hung. Lui ultimately declined to testify.

Lui argued that the government's evidence was insufficient to support an inference of bribery and that there was, in any event, an innocent explanation. The government argued that the undisputed facts were sufficient to establish probable cause, and that the explanation was inherently implausible. In addition, the government argued, it had two "smoking gun" statements directly saying the payments were bribes. We return to

---

**19.** The one exception to this was the October 1988 payment alleged in Count II, as to which the magistrate judge found a lack of probable cause.

**20.** Lui chose not to testify on his own behalf, as was his prerogative. The magistrate judge properly excluded the polygraph evidence offered by Lui to corroborate his testimony. The polygraph evidence was not relevant, there being no such testimony in evidence to corroborate. Whether it would be admissible if he did testify, we do not address.

these two statements and Lui's attack on them later.

The magistrate judge concluded that the explanation proffered by Lui's counsel—"to the effect that the payments represented a gratuitous gesture of gratitude by one of GIL's former principals for Lui's assistance in introducing him to a supplier of Japanese cigarettes in 1987, some six years before the last payments were made"—was inherently implausible. *Lui Extradition,* 939 F.Supp. at 955.[21] The implausibility of the explanation does give credence to the government's theory. *See United States v. Burgos,* 94 F.3d 849, 867 (4th Cir.1996) (implausible tales to the finder of fact can rationally be viewed as circumstantial evidence of guilt), *cert. denied,* — U.S. ——, 117 S.Ct. 1087, 137 L.Ed.2d 221 (1997). Without consideration of the two "smoking gun" statements, the magistrate judge was fully warranted in finding probable cause.

In addition, the two statements, which Lui argues were inadmissible, were properly admitted at the probable cause stage of the extradition hearing and further support a finding of probable cause.

The first statement was given to Hong Kong investigators in July 1994 by Chui, one of Lui's alleged coconspirators. Chui was one of the principals of GIL until April 1993. In his statement, Chui implicated himself and other principals of GIL in a scheme to bribe Lui and others to secure favorable allocations of cigarettes from BAT–HK. According to Chui, GIL began paying bribes to Lui when they first anticipated that Lui might eventually become an important BAT–HK decision-maker. Chui was murdered in Singapore nine months after giving this statement.

The second statement was made by Francis McNamara Haddon–Cave, who worked with Chui. Haddon–Cave testified in Hong Kong in October 1995 at a hearing to determine the sufficiency of the evidence to commit one of Lui's alleged coconspirators for

trial on a charge of conspiracy to bribe Lui. Haddon–Cave testified that he was hired by Chui to work as a consultant for GIL and began working there in October 1992. One of Haddon–Cave's responsibilities was to foster relationships between GIL and major suppliers like BAT–HK. Haddon–Cave testified that Chui told him in Lui's presence that Lui was "our man" and an important link with GIL. Lui, then BAT–HK's Director of Exports, did not deny it. Haddon–Cave further testified that later, outside of Lui's presence, Chui told him that Lui was "on the take" and had become wealthy as a result of the payments that distributors made to him to secure favorable allocations of cigarettes.

 The framework for determining admissibility of evidence here is determined by the Treaty itself and by United States legal rules governing admissibility in extradition proceedings. Pursuant to federal statute, documents offered as evidence in an extradition hearing:

> shall be received and admitted as evidence ... for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped....

18 U.S.C. § 3190.[22] Proof of such authentication is the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country. *Id.* Additionally, article VII(5) of the Treaty provides that any evidence given upon oath or affirmation "shall be received in evidence in any proceedings for extradition" if it is duly authenticated. Treaty, art. VII(5). Both the Haddon–Cave testimony and the Chui statement meet this authenticity requirement and were thus admissible at the extradition hearing by the terms of the relevant statute and treaties.

---

**21.** The statement in the magistrate's opinion that Lui adduced only counsel's argument and not explanatory evidence, *Lui Extradition,* 939 F.Supp. at 955, is obviously an oversight. Among other items, the Hung Wing Wah affidavit was admitted into evidence and considered by the magistrate judge.

**22.** Lui does not rely on the language of 18 U.S.C. § 3190. Most courts reviewing the language have concluded that § 3190 requires only that the evidence meet any authentication requirement imposed by a foreign tribunal, not that it be admissible, much less that it be admissible at trial. *See Oen Yin–Choy,* 858 F.2d at 1406; *Lui Extradition,* 939 F.Supp. at 934 (citing cases).

 Lui argues nonetheless that the two statements were improperly admitted because they would be inadmissible at trial under Hong Kong law. Lui argues that it is inherently unfair to certify that he is extraditable on the basis of evidence that would be inadmissible in the court where he would face trial. He also argues that failure to consider the Hong Kong High Court's declaratory judgment (later reversed) that the Chui statement would be inadmissible would evince great disrespect for the judicial system of Hong Kong. Both of these arguments are misplaced.

 In probable cause hearings under American law, the evidence taken need not meet the standards for admissibility at trial. Indeed, at a preliminary hearing in federal court a "finding of probable cause may be based upon hearsay in whole or in part." Fed.R.Crim.P. 5.1(a). This is because a "preliminary hearing is not a minitrial of the issue of guilt," *Coleman v. Burnett*, 477 F.2d 1187, 1201 (D.C.Cir.1973); rather, "its function is the more limited one of determining whether probable cause exists to hold the accused for trial." *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968). An extradition hearing similarly involves a preliminary examination of the evidence and is not a trial. *Charlton v. Kelly*, 229 U.S. 447, 461, 33 S.Ct. 945, 949–50, 57 L.Ed. 1274 (1913); *Romeo v. Roache*, 820 F.2d 540, 544 (1st Cir.1987). An extradition hearing does not require a higher standard of evidence than a probable cause hearing. The special and limited nature of extradition hearings is manifested in a more lenient standard for admissibility of evidence. Neither the Federal Rules of Criminal Procedure, *see* Fed.R.Crim.P. 54(b)(5), nor the Federal Rules of Evidence, *see* Fed.R.Evid. 1101(d)(3), apply to extradition hearings. The evidence may consist of hearsay, even entirely of hearsay. *Collins v. Loisel*, 259 U.S. 309, 317, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922). So American domestic law has already resolved against Lui any claim that there is a violation of Constitutional rights from the admission of hearsay evidence at a probable cause hearing which would not be admitted at trial.

Under Hong Kong law, the Haddon–Cave statement and the Chui statement present separate and distinct issues. The Haddon–Cave statement was ruled inadmissible at the Hong Kong trial of Chong Tsoi–Jun ("Chong"), an alleged co-conspirator, on an objection that it was not made in furtherance of the conspiracy.

As to the Chui statement, a Hong Kong High Court judge issued a declaration that the statement was inadmissible hearsay. On appeal, the Hong Kong Court of Appeal vacated this ruling, finding that Lui's request for a declaratory judgment was not justiciable in the Hong Kong courts, but that even if it were, the judge's grant of the declaration would be an abuse of discretion. The Court of Appeal reasoned that the issue of the admissibility of the Chui statement in the extradition proceeding was a matter for the United States court to decide. The court noted, however, that the parties agreed that the statement was inadmissible hearsay under Hong Kong law. In light of the Hong Kong court's statement that the admissibility of the Chui statement in the extradition hearing is a matter for the United States court to decide, admission of the statement into evidence cannot be viewed as a sign of disrespect for a sister court.

The focus on admissibility is, we think, misplaced, both based on these facts and on larger, institutional concerns about the operation of habeas corpus in extradition certifications. While in *Manzi* we "recognized that serious due process concerns may merit review beyond the narrow scope of inquiry in extradition proceedings," there is no serious due process issue here. *See Manzi*, 888 F.2d at 206; *see also Koskotas*, 931 F.2d at 174; *cf. Burt*, 737 F.2d at 1481; *Gallina*, 278 F.2d at 78. Lui's liberty interests are protected by the very existence of "an unbiased hearing before an independent judiciary." *In re Kaine*, 55 U.S. (14 How.) 103, 14 L.Ed. 345 (1852).

 Inherent in the probable cause standard is the necessity of a determination that the evidence is both sufficiently reliable and of sufficient weight to warrant the conclusion. The probable cause standard does not even require that the government make

its showing by a preponderance of the evidence. But neither is it toothless. All evidence does not have the same importance even if it is authentic and admissible. For example, a confession obtained by duress is inherently unreliable and would be given little weight even if the confession were authenticated. *See Gill v. Imundi,* 747 F.Supp. 1028, 1042–47 (S.D.N.Y.1990). The reliability of the evidence is a factor for the reviewing court to consider as well, and potentially unreliable evidence may be accorded reduced weight by the court. *Restatement, supra,* § 478.

No such concerns about reliability are implicated here. First, the statements themselves were neither involuntary nor obtained under questionable circumstances. Further, the Hong Kong courts did not rule that either statement was untrue or otherwise cast doubt on the statements' credibility. Each statement was thought inadmissible in Hong Kong on grounds pertaining to hearsay. The Haddon–Cave statement was deemed inadmissible because it did not meet one of the requirements for admissibility of a co-conspirator's statement. The Chui statement was thought inadmissible because the declarant was dead. The Hong Kong government alleges that Chui was involved in the conspiracy until he became a government informant and witness and that he was murdered in order to prevent him from testifying. GIL directors, including Hung and Chong, allegedly tried to dissuade Chui from cooperating with the ICAC. We need not reach the issue of whether the statement of a declarant, murdered to keep him from testifying, might be admissible at a criminal trial in the United States, *cf. United States v. Houlihan,* 92 F.3d 1271 (1st Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997), whatever the consequence of these facts under Hong Kong law. Nevertheless, we note that the Chui statement might well be admissible under United States law as a statement against interest. *See* Fed.R.Evid. 804(b)(3). The magistrate judge correctly ruled that the two statements were not unreliable.

One final argument need not detain us long. Lui argues, from his counsel's tactical decision not to present his testimony at the extradition hearing, that he was precluded from testifying. He argues that the magistrate judge drew an unfavorable inference, in violation of his Fifth Amendment rights, from his failure to testify. The argument misapprehends what happened. The magistrate judge did no such thing. Lui presented testimony from Hung and five other affiants, as well as argument of counsel attempting to explain the payments and loans. The magistrate judge disbelieved the explanation, as it was within his discretion to do. There is nothing in this objection.

For these reasons we reverse the grant of habeas corpus by the district court. We continue in effect the requirement that Lui be held without bail. If Lui wishes to file a petition for rehearing and/or a petition for rehearing en banc with this court, he must do so within 14 calendar days. *See* Fed. R.App.P. 40(a) & 35(c). We stay, in any event, delivery of the certification of extraditability to the Secretary of State during this 14 calendar day period to permit Lui to seek relief from the United States Supreme Court.

So ordered.

Before TORRUELLA, Chief Judge, and SELYA, BOUDIN, STAHL *, and LYNCH, Circuit Judges.

## ORDER OF EN BANC COURT

The suggestion for the holding of a rehearing en banc having been carefully considered by the judges of this Court in regular active service and a majority of said judges not having voted to order that the appeal be heard or reheard by the Court en banc,

It is ordered that the suggestion for rehearing en banc be denied.

STAHL, Circuit Judge, (dissenting).

Because I do not believe that the panel's opinion reaches the correct result, and because I believe that this case raises numerous difficult and complex questions of law that warrant the full court's considered attention, I would grant the petition. I there-

* Dissent follows.

fore respectfully dissent from the court's decision to deny rehearing en banc.

## I. The Treaty Language

The extradition request in this case was made by authorities of the British Crown Colony of Hong Kong pursuant to two bilateral treaties dating from 1972—a primary agreement and a supplemental treaty—that both the United States and the United Kingdom have signed and ratified.[1] The main treaty applies to Hong Kong by an exchange of diplomatic notes made in October 1976, *see* 28 U.S.T. at 238–41, while the supplemental treaty by its terms applies to the United Kingdom and "the territories for whose international relations the United Kingdom is responsible," which, as listed in an annex, includes Hong Kong.[2] In 1984, the United Kingdom and the People's Republic of China issued a Joint Declaration, which was ratified and entered into force in 1985, under which sovereignty over Hong Kong will revert to China on July 1, 1997.[3] In 1985, the United States signed the supplemental treaty and the United States Senate ratified it the following year. Despite being ratified after the well-publicized Sino–British Joint Declaration regarding Hong Kong's future status, the supplemental treaty says nothing about fugitives sought for extradition ("relators") to Hong Kong, like Lui Kin–Hong, who can demonstrate that their trial will occur after Hong Kong's reversion to China.

"In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." *United States v. Alvarez–Machain,* 504 U.S. 655, 663, 112 S.Ct. 2188, 2193, 119 L.Ed.2d 441 (1992) (citing *Air France v. Saks,* 470 U.S. 392, 397, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985); *Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 11, 57 S.Ct. 100, 103–04, 81 L.Ed. 5 (1936)). Article I of the primary US–UK bilateral extradition treaty provides that "[e]ach Contracting Party undertakes to extradite to the other" persons accused or convicted of certain enumerated offenses "subject to the conditions specified in this Treaty." Among the conditions that the treaty specifies are those found in Article XII, which incorporates a "specialty" provision, a common feature of extradition treaties,[4] and contains a prohibition against a relator's re-extradition to stand trial in a third state. Article XII in relevant part provides:

(1) A person extradited shall not be detained or proceeded against in the territory of the requesting Party for any offense other than an extraditable offense established by the facts in respect of which his extradition has been granted, or on account of any other matters, nor be extradited by that Party to a third State—

(a) until after he has returned to the territory of the requested Party; or

(b) until the expiration of thirty days after he has been free to return to the territory of the requested Party.

---

1. *See* Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 8, 1972, 28 U.S.T. 227 [hereinafter "the treaty"] *and* Supplemental Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 25, 1985, T.I.A.S. No. 12050 [hereinafter "the supplemental treaty"].

2. The supplemental treaty specifically applies to Great Britain and Northern Ireland, the Channel Islands, the Isle of Man, Anguilla, Bermuda, the British Indian Ocean Territory, the British Virgin Islands, the Cayman Islands, the Falkland Islands, the Falkland Island Dependencies, Gibraltar, Hong Kong, Montserrat, Pitcairn, Henderson, Ducie and Oeno Islands, St. Helena, the St. Helena Dependencies, the Sovereign Base Areas of Akrotiri and Dhekelia in the Island of

Cyprus, Turks and Caicos Islands. *See* Art. 6 & Annex.

3. *See* Joint Declaration of the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the People's Republic of China on the Question of Hong Kong, Dec. 19, 1984, 1984 Gr. Brit. T.S. No. 20 (Cmd.9352) [hereinafter "the Joint Declaration"].

4. *See* Kenneth E. Levitt, Note, *International Extradition, The Principle of Specialty, and Effective Treaty Enforcement,* 76 Minn. L.Rev. 1017, 1022–24, 1027–28 (1992) ("The principle of specialty allows requesting states to try or punish defendants only for the offenses for which they were extradited.... Most United States extradition treaties currently in force, and all negotiated within the last one hundred years, incorporate the principle of specialty.").

Lui's case raises the difficult question of the proper interpretation to be given to this Article of the extradition treaty and the specialty provision incorporated therein in the peculiar situation that the record reveals. The evidence shows and the government concedes that Lui will be tried in the court system of a sovereign other than that of the requesting Party and different than the one he would have been tried by but for the reversion of sovereignty over Hong Kong to China. As the district court found in granting habeas relief, the "uncontradicted evidence" establishes, as the government now concedes, that "[t]he reality ... is that the Crown Colony of Hong Kong will not be able to try and to punish Lui by the time of reversion." *Lui Kin–Hong v. United States,* 957 F.Supp. 1280, 1285 (D.Mass.1997) (as corrected January 9, 1997).

The difficult question Lui's case presents is whether a certification of extraditability pursuant to the US–UK bilateral extradition treaty and 18 U.S.C. §§ 3181, 3184 can issue in these circumstances. For the reasons that follow, I believe it cannot.

On its face, Article XII of the treaty prohibits a requesting Party from trying and punishing the relator for crimes other than those for which he has been extradited. Moreover, it prohibits a requesting Party from extraditing the relator to a third-party sovereign. As I read Article XII, therefore, the fairest and most reasonable inference to be drawn from the treaty's language is that it allows only for extradition for offenses that will be tried and punished by the requesting sovereign.

This is not the case we have before us. Thus, in my view, the district court correctly concluded that the most reasonable inference from Article XII's language is that the treaty "prohibits a person from being extradited to Hong Kong if Hong Kong, as a Crown Colony of the United Kingdom, is unable to try and to punish him." 957 F.Supp. at 1287. I believe that the logical inference to be drawn from the quoted treaty language is that Article XII requires the requesting Party to retain exclusive jurisdiction and custody over relators extradited to it by the requested Party. To me, the natural meaning of the language in Articles I and XII suggests that a "condition" to extradition under the treaty is that a relator is to be tried and punished in the courts and prisons of the Contracting Party requesting extradition. This requirement is subject solely to the exceptions provided for in subsections (1)(a) and (b), which do not apply here because the realty in this case is that Crown Colony authorities will neither return Lui to United States territory nor give him 30 days' freedom to leave Hong Kong prior to surrendering him to their Chinese successors, as those subsections would alternately require. On the facts revealed, therefore, I believe the district court correctly concluded that Lui cannot be certified for extradition because the United Kingdom fails to "live up to the terms of its extradition agreement with the United States." *Id.* at 1286.

The purpose to be gleaned behind Article XII's words also supports the position that Lui cannot be certified for extradition in the current circumstances. This circuit has indicated that "[t]he existence of such [an extradition] treaty between the United States and another country indicates that, at least in a general sense, the executive and legislative branches consider *the treaty partner's* justice system sufficiently fair to justify sending accused persons there for trial." *In re Extradition of Howard,* 996 F.2d 1320, 1329 (1st Cir.1993) (emphasis added) (citing *Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911); *Neely v. Henkel (No. 1),* 180 U.S. 109, 123, 21 S.Ct. 302, 307, 45 L.Ed. 448 (1901)).

In this particular instance, I agree with the district court that the US–UK bilateral treaties are "premised on the trust running between the United States and the United Kingdom." *Lui,* 957 F.Supp. at 1288. In my view, the district court rightly noted that Article XII's language manifests an exchange of promises between our nation and a trusted treaty partner: "[t]he United Kingdom is promising that it, and only it, will try and will punish [relators like] Lui for specified crimes, and no others. By its adoption of the Treaty, the United States manifests its belief

**124**

in that promise of the United Kingdom." *Id.* Because the Crown Colony's extradition request in this case fails to live up to this promise by the United Kingdom, I believe that the district court properly concluded that a certification for Lui's extradition to Hong Kong cannot issue. As this court has recently explained, in extradition cases "[t]he requesting state must 'live up to whatever promises it made in order to obtain extradition.'" *United States v. Saccoccia,* 58 F.3d 754, 766 (1st Cir.1995) (quoting *United States v. Najohn,* 785 F.2d 1420, 1422 (9th Cir.) (per curiam), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 652, 93 L.Ed.2d 707 (1986)).[5]

In arriving at my conclusion I am mindful of the Supreme Court's seminal extradition decision in *Terlinden v. Ames,* 184 U.S. 270, 289, 22 S.Ct. 484, 491–92, 46 L.Ed. 534 (1902). In *Terlinden,* the Court explained that a state requesting a relator's extradition must be "competent to try and to punish him." *Id.* at 289, 22 S.Ct. at 492. The *Terlinden* Court was asked to determine whether the German Empire could successfully request a relator's extradition on the basis of a treaty between the United States and the Kingdom of Prussia, where the two sovereigns, King and Emperor, were one and the same. *See id.* at 284, 22 S.Ct. at 489–90. The Court concluded that the Kingdom of Prussia, although part of the subsequently formed German Empire, continued to enjoy "its identity as such," and treaties that it had entered could still be performed "either in the name of its King or that of the Emperor." *Id.* at 285, 22 S.Ct. at 490. In making its determination, the Court explained that "the question whether power remains in a foreign State to carry out its treaty obligations is in its nature political and not judicial, and that the courts ought

not to interfere with the conclusions of the political department in that regard." *Id.* at 288, 22 S.Ct. at 491.

The situation in *Terlinden,* however, is different than the one raised by Lui's case. In *Terlinden,* the question was whether or not the Kingdom of Prussia continued to have an independent existence and whether its treaty obligations could be exercised in the name of its King notwithstanding the fact that he had subsequently acquired "the title of German Emperor." *Id.* at 284, 22 S.Ct. at 490. The impending reversion of sovereignty over Hong Kong does not raise this question. No one doubts—and the government does not dispute—that the Crown Colony of Hong Kong will cease to exist beyond reversion to China. If some doubt existed on this score, *Terlinden* counsels that the judicial department would have to defer to the judgment of the political branches because the action of the political branches of government "must be regarded as of controlling importance" on the question of "whether [a] treaty has ever been terminated." 184 U.S. at 285, 22 S.Ct. at 490. Lui's case frames an entirely different question. The extradition request from the Crown Colony of Hong Kong does not raise the issue of whether or not the US–UK extradition treaties have been terminated. Instead it raises the question of whether the requesting sovereign is "competent to try and to punish him." *Id.* at 289, 22 S.Ct. at 492.

In my view, the Supreme Court in *Terlinden* makes a distinction between a state's "power ... to carry out its treaty obligations" (a determination on which the judiciary must defer to the political branches), *id.* at 288, 22 S.Ct. at 491, and a state's "competen[ce] to try and to punish" a relator. *Id.* at 289, 22 S.Ct. at 492. The first issue

5. The panel opinion relies upon *Saccoccia,* a case that involved the interpretation of an extradition treaty between the United States and Switzerland, to argue that federal extradition procedures do not give judicial officers the discretion to refuse the issuance of certificates of extraditability "on the ground that a treaty partner cannot assure the requested country that rights under a treaty will be enforced or protected." Op. at 115 (citing *Saccoccia,* 58 F.3d at 766–67). My research fails to find support for the proposition for which the panel cites *Saccoccia.* On my

reading, *Saccoccia* indicates that Article XII's "specialty" provision does not require an exact mirror-image between the precise indictment that prompts an extradition and the subsequent prosecution. *See* 58 F.3d at 766–67. Because that is not the problem that I believe to be fatal to the extradition request in Lui's case, and as I indicate in the main body of my dissent, I believe that *Saccoccia* is properly read, if at all, to support an interpretation of Article XII that would preclude the issuance of a certificate of extraditability in the unique circumstances present here.

goes to the question of whether a treaty partner—and hence a treaty relationship—still exists. On this issue, *Terlinden* informs us that courts must defer to the determination of the political branches. *See id.* at 285, 288, 22 S.Ct. at 490, 491. The second issue goes to the question of whether a treaty partner is fulfilling the promises and obligations it has undertaken with the United States. *See id.* at 289, 22 S.Ct. at 491–92. The Court's discussion in the paragraphs following its reference to sovereign competency makes clear that courts retain the authority and duty to ascertain that the treaty-established prerequisites to extraditability have been met in a particular case. The Court noted that no question existed in the case before it that the treaty-created preconditions for extradition had been met. As the Court explained,

> *If it be assumed* in the case before us, *and the papers presented* on the motion for a stay *advise us that such is the fact, that* the commissioner, on hearing, deemed the evidence sufficient to sustain the charges, and certified his findings and the testimony to the Secretary of State, and a warrant for the surrender of Terlinden on *the proper requisition was duly issued, it cannot be successfully contended that the* courts could properly intervene on the ground that the *treaty under which both governments had proceeded, had terminated* by reason of the adoption of the constitution of the German Empire, notwithstanding the judgment of both governments to the contrary.

*Id.* at 289–90, 22 S.Ct. at 492 (emphasis added).

Therefore, contrary to the panel opinion's suggestion, the district court correctly concluded that *Terlinden* teaches that this court has jurisdiction to examine whether the Hong Kong extradition request fulfills the obligations undertaken by the United Kingdom under the treaty. *See Lui,* 957 F.Supp. at 1285–86. Unlike *Terlinden,* the relator in this case does not argue that the extradition treaty under which he has been sought has been terminated because the requesting sovereign no longer exists. Instead Lui argues and the record reveals that the Crown Colo-

ny of Hong Kong, though it currently exists, will not try or punish him before reversion and thus does not meet the conditions imposed by Articles I and XII of the treaty and the *Terlinden* requirement that an authority requesting a relator's extradition must be "competent to try and to punish him." 184 U.S. at 289, 22 S.Ct. at 492.

As I read it, Article XII indicates that the United States and the United Kingdom undertook an agreement to extradite relators but only for trial and punishment in the courts and prisons of each other. Because it is conceded that the extradition request in this case will result in Lui's being tried and punished under the courts of another sovereign, my reading of Articles I and XII of the treaty convince me that the British Hong Kongese authorities fail to live up to the obligations undertaken by the United Kingdom. If Lui may be extradited at all pursuant to the bilateral US–UK extradition treaties, I read the relevant treaty provisions to say that this may occur only if the United Kingdom or authorities accountable to it retain exclusive jurisdiction over Lui's person following Hong Kong's reversion to China. Because the Crown Colony will surrender custody over Lui and jurisdiction over his criminal case to the Chinese successor regime, I am of the opinion that the extradition request in this peculiar set of circumstances constitutes a violation of the relevant treaty terms. As such, I believe that no certification of extraditability can issue from this court pursuant to the US–UK extradition treaty and 18 U.S.C. §§ 3181, 3184.

## II. · The Re-extradition Prohibition

Lui's case also presents a difficult question with respect to whether the United Kingdom's surrender of sovereignty over Hong Kong to China in July 1997 would effect an impermissible re-extradition with respect to Lui under the terms of Article XII. For the reasons that follow, I believe it would.

Article XII in relevant part provides that "[a] person extradited [to a requesting Party] shall not . . . be extradited by that Party to a third State." Here, upon reversion, the United Kingdom will surrender sovereignty

and responsibility for the administration of justice in Hong Kong to China. In the event that Lui is extradited to Hong Kong prior to reversion, the record shows beyond question that he will be surrendered to the courts and judicial system of a third-party sovereign state for prosecution. The difficulty lies in determining whether reversion and Lui's surrender to the Chinese regime that will succeed the Crown Colony amounts to another extradition.

The plain meaning and derivations of the words "extradite" and "extradition" help lead me to conclude that the surrender contemplated for Lui would constitute another extradition. The dictionary definition of "extradite" is, "To deliver up, as to another state or nation." *Funk & Wagnalls New Comprehensive International Dictionary of the English Language* 450 (1978). "Extradition" is alternatively defined in dictionaries as, "The surrender of an accused person by a government to the justice of another government, or of a prisoner by one authority to another," *id.,* as "the surrender of an alleged fugitive from justice or criminal by one state, nation, or authority to another," *The Random House Dictionary of the English Language* 685 (2d ed.1987), and as, "The surrender or delivery of an alleged criminal usu[ually] under the provisions of a treaty or statute by one country, state, or other power to another having jurisdiction to try the charge." *Webster's Third International Dictionary* 806 (1986).[6]

Legal usage has followed the word's plain meaning. Black's Law Dictionary defines "extradition" by closely paraphrasing the formula given in *Terlinden,* wherein the Supreme Court defined "[e]xtradition" as *"the surrender by one nation to another of an individual* accused or convicted of an offence outside its own territory, and within the territorial jurisdiction of the other, which, being competent to try and to punish him, demands the surrender." 184 U.S. at 289, 22 S.Ct. at 492 (emphasis added); *Black's Law Dictio-*

*nary* 526 (5th ed.1979) (replacing the word "nation" with "state or country").

International practice is consistent with this legal usage of the term. Prohibitions on re-extradition, like that found in Article XII, are fundamental features of "many [extradition] treaties" that are generally interpreted to give force to the broad principle of international law that "a person extradited to one state may not be *extradited or otherwise surrendered to a third state for prosecution."* Restatement (Third) of Foreign Relations Law § 477 cmt. d.

The operative plain meaning of the word, its legal usage, international practice, and its etymological derivation all indicate that the surrender which the record shows and the government concedes is contemplated for Lui would constitute another extradition. Upon reversion, the United Kingdom will surrender sovereignty to China as well as surrender jurisdiction over and custody of criminal defendants like Lui. Using the *Terlinden* definition, on the peculiar circumstances in this case, upon reversion: (1) Lui will be "surrender[ed]" by one nation to another"; (2) he will be "an individual accused ... of an offence outside [the extraditing authority's] own territory," because authority over that territory will pass from the United Kingdom to China; (3) the offenses for which Lui is accused "will be within the territorial jurisdiction" of the receiving authority, *viz.,* China; and (4) the receiving authority, under Sino–British international agreements, specifically the Joint Declaration regarding reversion, will be "competent to try and to punish him." 184 U.S. at 289, 22 S.Ct. at 492.

Having canvassed the relevant sources that help to illuminate the meaning of the word "extradition," I believe that the revealed reality that the Crown Colony will surrender custody over Lui and jurisdiction over his criminal case to the Chinese successor regime contemplates another extradition in violation of Article XII of the US–UK bilateral extradition treaty. A decision of

---

**6.** The derivation of the English word is from the French, Old French and ultimately Latin equivalents. Specifically, the English "extradition" stems from a Latin union of the prefix *ex-* [out] and *traditio* [a delivery or surrender], the latter word flowing from *traditus,* the past participle of

tradere [to deliver], which, in turn, stems from the conjunction of *trans-* [across] and *dare* [give]. *See Funk & Wagnalls New Comprehensive International Dictionary of the English Language* 450, 1330 (1978).

the Ninth Circuit, on which the panel opinion in the instant case relies, reaches a contrary result. *See Oen Yin–Choy v. Robinson,* 858 F.2d 1400, 1403–04 (9th Cir.1988). Starting from the premise that this case is not controlling in this court, this circuit should decline to follow this decision because I believe that its argument is neither thorough nor persuasive. Moreover, the Ninth Circuit was faced by a fact pattern quite unlike the heightened and unique circumstances present in Lui's case and thus was not required to squarely face the issue presented here.

In *Oen,* the United States Attorney, acting on behalf of the United Kingdom and the Crown Colony of Hong Kong, initiated extradition proceedings against Oen in April 1987, a full decade before the scheduled date of reversion. *Id.* at 1403. Oen was charged with false accounting and publishing a false statement, extraditable offenses under Article III of the US–UK extradition treaty. *Id.* at 1405. Oen argued that if he was extradited and convicted then the possibility existed that he would remain incarcerated beyond July 1, 1997, the date of reversion. He argued that this hypothetical scenario would have the effect of extraditing him to China in violation of Article XII of the treaty. *Id.* at 1403.

The Ninth Circuit disagreed and concluded that the *Terlinden* definition of "extradition" meant that "[n]either deportation nor surrender other than in response to a demand pursuant to Treaty constitutes extradition." *Id.* at 1404. Having thus rephrased the *Terlinden* definition, the Ninth Circuit panel concluded that "*even if* Oen becomes subject to Chinese authority pursuant to a reversion of sovereignty upon cession and termination

of the British lease of Hong Kong, he will not have been extradited to China." *Id.* (emphasis added).

I find the *Oen* court's conclusion unsatisfactory for three reasons. First, as my previous discussion elaborates, it does not follow from either the commonly settled meaning of the word "extradition" or the term's operative legal usage, as manifested by the Supreme Court's definition in *Terlinden.* Instead it proceeds upon a rearticulated and truncated sense of the term that does not correspond to *Terlinden* and that cuts against international practice and the meaning that the term and its French and Latin cognates have carried since Roman antiquity.

Second, even on its own terms, the *Oen* court misapplied the meaning of the word "extradition." Specifically, even if one accepts the *Oen* view that a surrender must be effectuated in response to a demand pursuant to treaty in order for it to constitute an extradition, then a Hong Kong relator's postreversion surrender would qualify. In view of the treaty architecture that surrounds the impending reversion and the provisions in the Joint Declaration that address the juridical and legal transfer of sovereignty, it is difficult to see how the Crown Colony will surrender custody over Lui and jurisdiction over his criminal case to the Chinese successor regime in the absence of the demands on his person *qua* criminal defendant that owe their legal status solely to treaty. *See, e.g.,* Sino–British Joint Declaration, para. 1 ("The Government of the People's Republic of China declares ... that it has decided to resume the exercise of sovereignty over Hong Kong with effect from 1 July 1997.").[7]

---

7. The surrender of sovereignty and Chinese demands on Hong Kongese criminal defendants upon reversion all flow from treaty provisions. The United Kingdom's sovereignty over Hong Kong stems from cessions of territory made in 1842 (pursuant to the Treaty of Nanking) and 1860 (pursuant to the Convention of Peking) and a ninety-nine year lease contained in the Convention of Beijing, June 9, 1898. *See* Shawn B. Jensen, *International Agreements Between the United States and Hong Kong Under the United States–Hong Kong Policy Act,* 7 Temp. Int'l & Comp. L.J. 167, 168–69 (1993); *see also* 1 *Treaties and Agreements with and Concerning China,* 1894–1919, 130, No. 1898/11 (1921) (*cited in*

*Oen,* 858 F.2d at 1403). Moreover, the three constitutive parts of Hong Kong—Hong Kong proper (1842), Kowloon (1860), and the New Territories (1898)—are scheduled to revert to China on July 1, 1997 pursuant to the Sino–British Joint Declaration which was signed on December 19, 1984 and entered into force on May 27, 1985. *See* Jensen, *supra,* at 170–73. That international agreement, by addressing the Chinese successor regime's executive, legislative, and judicial powers, provides for the transfer of jurisdiction over persons accused of criminal offenses and in custody in Hong Kong at the date of reversion. See Joint Declaration, para. 3(3).

Third, the factual pattern in *Oen* was radically dissimilar to the one that the court faces in this case. In *Oen,* the relator raised only a distant hypothetical possibility that he would remain incarcerated in Hong Kong prisons following reversion some ten or nine years later. No one doubted that Oen, upon extradition, would be tried and, if necessary, sentenced by courts of the British Crown Colony and imprisoned in Crown Colony gaols.

The *Oen* court thus did not address itself to the situation in this case, where it is certain as a practical matter and conceded by the government that the relator's trial would not be under the courts of the British Crown Colony. Therefore, the *Oen* decision did not fully address the issue that squarely confronts us today, whether Lui's surrender to Chinese authorities after reversion *for trial* will amount to another extradition. Read closely, *Oen* simply refuses to conclude that a previously convicted, already incarcerated prisoner is extradited upon reversion. This is not the predicament with Lui. I thus believe that *Oen* is unpersuasive and not on point.

### III.

### Legislative Intent, Judicial Deference, and Separation of Powers

Lui's case also presents a difficult question with respect to whether certification of extradition in the circumstances known to the court and conceded by the government would comport with the legislature's intent in ratifying the US–UK extradition treaties. For the reasons that follow, I do not believe certifying Lui for extradition would accord with legislative intent.

The legislative history surrounding the United States Senate's ratification of the supplementary treaty, which the district court

ably canvassed, indicates that the Senate was concerned about the extent and degree to which it could trust the United Kingdom and its judicial system to be fair and just, ultimately concluding that the United Kingdom's courts were worthy of confidence. *See* 99th Cong., 2d Sess., 132 Cong. Rec. 9119–71 (daily ed. July 16, 1986) (reprinting the Senate floor debate on ratification) (*cited in Lui,* 957 F.Supp. at 1287–88). In my view, to interpret the bilateral treaties between the United Kingdom and the United States so as to allow the benefits of such specially placed trust to be assumed by a non-signatory sovereign would fail to adhere to the Senate's intent. As the district court explained, "[i]t is clear beyond rational dispute that the Senate would not have ratified had there been any suggestion that the Treaty provisions could be extended, even by circumstance, to China." *Lui,* 957 F.Supp. at 1289.

I reach this conclusion understanding full well that the United States signed an agreement on December 20, 1996 with the government of the fledgling Hong Kong Special Administrative Region ("HKSAR"), the British Crown Colony's successor, which provides for reciprocal post-reversion extradition. *See* Agreement Between the Government of the United States of America and the Government of Hong Kong for the Surrender of Fugitive Offenders, Dec. 20, 1996. However, the new treaty constitutes a different bargain than the one voted upon by the Senate when it ratified the US–UK bilateral treaties. Moreover, the new agreement will not enter into force, if it indeed does so, until such time as the Senate, to which the new treaty was submitted on March 3, 1997, gives its advice and consent by a constitutionally required two-thirds vote. *See* U.S. Const. art. II, § 2; 143 Cong. Rec. § 1846 (daily ed. Mar. 3, 1997).[8]

---

8. In reaching this conclusion, I am mindful of the United States–Hong Kong Policy Act of 1992 (commonly known as the McConnell Act), codified at 22 U.S.C. §§ 5701–5732. As commentators have explained, this congressional enactment "allows the United States to treat Hong Kong, where appropriate, as a separate entity from the PRC for purposes of U.S. domestic law." Christopher K. Costa, Comment, *One*

*Country—Two Foreign Policies: United States Relations With Hong Kong After July 1, 1997,* 38 Vill. L.Rev. 825, 855 (1993). Under the McConnell Act's provisions, "the areas in which separate treatment is appropriate are determined by the terms of the [Sino–British] Joint Declaration .... [which] grants Hong Kong a 'high degree of autonomy' in nine areas: economic policy, trade, finance, monetary policy, shipping, communica-

In my view, therefore, the recently signed US–HKSAR extradition treaty is itself highly probative of the proper interpretation that must be given to the existing bilateral extradition treaties between the United States and the United Kingdom under which Lui's extradition to Hong Kong is being sought. Put simply, these treaties do not survive the surrender of sovereignty to China and do not contemplate the surrender of relators to stand trial in courts under the sovereign aegis of China. *See* Janice M. Brabyn, *Extradition and the Hong Kong Special Administrative Region,* 20 Case W. Res. J. Int'l L. 169, 173 (1988) ("Hong Kong's extradition relationships with other states ha[ve] always been exclusively vested in the British Crown.... Hong Kong's present extradition powers and relations are [thus] a direct consequence of, and are dependent upon, its colonial status. If nothing is done between now and 1997, both powers and relations will end when that colonial status ends.").

In ratifying the US–UK bilateral extradition treaties, I believe the political branches have judged the justice system of the United Kingdom and of the British Crown Colony of Hong Kong to be sufficiently fair to send accused persons there for trial. Until such time as the Senate ratifies the US–HKSAR extradition treaty no such similar expression of faith or trust has been made by the political branches with respect to China or to the Chinese successor to the British Crown Colony, which, if he is extradited, will try and punish Lui. The United States currently has no extradition treaty with China, which enjoys extradition relations with but one other country, Russia. Separation of powers principles and judicial self-restraint counsel that this court is not at liberty to interpret Article XII of the US–UK extradition treaty in such a way so as to yield a result for which the Senate did not bargain in ratifying the US–UK extradition treaty and which it is currently debating in the form of the recently

submitted US–HKSAR agreement. *See* 143 Cong. Rec. § 1846 (daily ed. Mar. 3, 1997).

Of special import is the fact that the supplemental US–UK treaty was ratified by the Senate in 1986 at a time when it was fully aware of the widely publicized Sino–British Declaration regarding Hong Kong's reversion in 1997. The supplemental treaty nonetheless does not limit or otherwise circumscribe the terms of Article XII of the main treaty. As the panel's opinion explains, the supplemental treaty, as ratified by the Senate in 1986, "is entirely silent on the question of reversion." Op. at 109. Because Article XII, on my reading, allows only for extradition for offenses that can be tried and punished by the requesting sovereign, and because the supplemental treaty does not create any exception for reversion-affected relators like Lui, the treaty, as I read it and as the district court found, indicates that no right to demand extradition and no corresponding duty to surrender Lui exists where it is conceded that Lui will not be tried under courts of the United Kingdom or its dependent territories.

This silence in the face of Article XII's apparent requirement that relators are only to be tried by the judicial authorities of the two Contracting Parties is telling because the presumption in American and international law is against extraditability in the absence of any treaty-created right or obligation. Applicable Supreme Court precedent and "[t]he principles of international law recognize no right to extradition apart from treaty. While a government may, if agreeable to its own constitution and laws, *voluntarily* exercise the power to surrender a fugitive from justice to the country from which he has fled ... *the legal right to demand* his extradition *and the correlative duty to surrender* him to the demanding country *exist only when created by treaty.*" *Factor v. Laubenheimer,* 290 U.S. 276, 287, 54 S.Ct. 191, 193, 78 L.Ed. 315 (1933) (emphasis added); *see also* 18

---

tions, tourism, culture and sport." *Id.* The McConnell Act would not appear to have any direct bearing on this case, which involves foreign affairs and international law enforcement,

because "[t]he Act does not establish a U.S. policy toward Hong Kong in the two areas reserved to PRC control by the Joint Declaration—defense

U.S.C. §§ 3181, 3184; Restatement (Third) of Foreign Relations Law § 475 & cmt. a.[9]

Despite the foregoing, the panel opinion construes the US–UK treaties as requiring Lui's extradition to Hong Kong by invoking, *inter alia,* the principles that extradition treaties are to be construed liberally in favor of enforcement, see op. at 110 (citing *Laubenheimer,* 290 U.S. at 298, 54 S.Ct. at 197), and with great deference to executive branch interpretation. *See id.* at 110 (citing *Laubenheimer,* 290 U.S. at 295, 54 S.Ct. at 196; *Howard,* 996 F.2d at 1330–31 & n. 6).

These arguments, while worthy of consideration, ultimately fail to justify a result that does not correspond to the relevant treaty provisions in Articles I and XII or to the congressional intent reflected therein, *viz.,* that the United States agrees to extradite fugitives sought by authorities in the United Kingdom and its dependent territories to be prosecuted in the courts and under the law of those jurisdictions. I agree with the district court that a refusal to certify Lui for extradition requires no untoward judicial interference with prerogatives constitutionally entrusted in the executive branch of government. On the contrary, separation of powers principles and the prevention of undue encroachment upon the Senate's constitutional prerogatives counsel against certifying Lui for extradition under the peculiar circumstances present in his case.

Specifically, I do not agree that refusing certification in Lui's case along the lines that the district court established implies any judicial arrogation of the executive's power over our affairs with foreign nations. Under the analysis ably laid out by the district court, the refusal to certify Lui's extraditability does not stem from any assessment or judgment about the fairness or trustworthiness of the Chinese judicial or penal systems, a determination that the third branch of government is not generally empowered or as qualified as the political branches to make. The district court correctly concluded that the certification question is an entirely legal one and that

> it would not matter if China's legal system were more efficient and humane than either the United States' or the United Kingdom's. The bottom line is that the terms of the Treaty do not allow extradition when the requesting sovereign is unable to try and to punish the relator. [And t]he Crown Colony of Hong Kong will be unable to try and to punish Lui prior to reversion.

*Lui,* 957 F.Supp. at 1289.

I therefore cannot agree with an interpretation of the US–UK bilateral treaties that would permit circumstances to conspire so as to allow a relator to be extradited to Hong Kong where the practical reality is that China, a sovereign state with which the United States has no extradition treaty, will try and punish Lui. Neither can I agree with the panel opinion's conclusion that, because Lui's extradition is sought by the current Hong Kong regime, the right to demand extradition and the correlative duty to surrender him in fact do exist, regardless of what is

---

and foreign affairs." *Id.* at 856; *see also* Jensen, *supra* note 7, at 180–81.

**9.** The United States recognizes only one statutory exception to this principle. Specifically, 18 U.S.C. § 3181(b) permits "the surrender of persons, other than citizens, nationals, or permanent residents of the United States, who have committed crimes of violence against nationals of the United States in foreign countries without regard to the existence of any treaty of extradition" upon the fulfillment of certain criteria. The instant case involves allegations of economic crimes and thus does not implicate this recently and narrowly drawn exception to the generally operative principle of American and public international law.

As the quotation from *Laubenheimer* indicates, it should be understood that this opinion draws a distinction between voluntary extradition and extraditability as of right or obligation. "[I]t is now clear that apart from a treaty a state has no duty to deliver up a person who has sought asylum within its boundaries. If the state wishes, it can afford him a refuge and protection.... Of course, a state is under no duty to afford asylum to a fugitive; it may expel him from its territories if it choose, and without complaint from the individual who is expelled." *United States ex rel. Donnelly v. Mulligan,* 74 F.2d 220, 222 (2d Cir.1934). This distinction may appear academic in light of the government's expressed desire to extradite Lui in this case, but it is a distinction that is not without significance.

conceded will transpire upon his arrival in Hong Kong.

The opinion correctly notes that "governments of our treaty partners often change, sometimes by ballot, sometimes by revolution or other means, and the possibility or even certainty of such change does not itself excuse compliance with the terms of the agreement embodied in the treaties between the countries." Op. at 106. But the instant case does not raise the question presented by a mere change in government, whether peacefully or violently accomplished. Instead it represents a situation in which *sovereignty* over a particular territory, Hong Kong, will revert from one sovereign, the United Kingdom, with whom the United States has signed and ratified an extradition treaty, to another sovereign, the People's Republic of China, with which the United States currently has no such treaty relationship.

In my view, this court cannot fail to differentiate between a change in government, which ordinarily does not affect treaty-based obligations, and a change in sovereignty brought about when territory of one sovereign state is ceded and becomes part of the territory of another preexisting state, which generally terminates the effect of treaties of the predecessor state with respect to the territory in question. *See* Vienna Convention on Succession of States in Respect of Treaties, art. 15. U.N. Doc. A/CONF. 80/31 (1978), 72 Am. J. Int'l L. 971 (1978).[10]

Whatever difficulties may arise in sorting out succession questions in other contexts,[11] in this case it is clear—and the executive branch does not question—that Hong Kong will not succeed to the rights and obligations contained in the US–UK extradition treaties, as might have been the case had Hong Kong become an independent state in its own right rather than reverting to Chinese sovereignty.

*See, e.g.,* Brabyn, *supra* at 174 ("For treaty-based relations, ex-colonies can often rely upon the general principles of treaty succession [to secure continuity in international legal relations].... Hong Kong [however] is not moving from colonial status to independence. It is being restored to the sovereignty, or resuming its place as part, of the PRC.... [After reversion, existing international treaties involving Hong Kong] must be read as subject to incompatibility with the sovereignty of the PRC.").

Accordingly, I believe that this court must recognize that the Crown Colony's present ability to fulfill the requirements imposed by the US–UK extradition treaties can only be assessed in light of the concession that the Crown Colony will not in fact try or punish him and with an eye to the fact that the Chinese successor regime in Hong Kong will not succeed to the Crown Colony's extradition rights and obligations. *See id.* Because of these facts, this court cannot certify Lui for extradition because the Crown Colony's extradition request fails to live up to the United Kingdom's promise, as I believe memorialized in the terms of the extradition treaties, to try all relators extradited from the United States in courts under its jurisdiction.

Finally, I am unpersuaded by the panel's argument that refusing to certify Lui for extradition would be improper because it might mean that "any relator extradited from the United States to Hong Kong at any point since the signing of the Joint Declaration, was, if he faced a term of imprisonment upon conviction that could conceivably extend past the date of reversion, sent to Hong Kong in violation of the Treaty." Op. at 116.

In the first place, as I explained earlier in discussing *Oen*, Lui's case raises a peculiar set of circumstances. The record indicates and the government concedes that Lui will

---

**10.** Although the Convention on Succession presently lacks the requisite signatories for it to enter into force, and although the United States is not a signatory, the Convention is nonetheless viewed as an authoritative statement of the rule governing the succession of states under public international law. *See* Jensen, *supra* note 7, at 180–81 (citing Michael Akehurst, *A Modern Introduction to International Law* 159 (1987) (noting that while the Convention on Succession "is not

yet in force ... many of its provisions codify the customary international law on the subject")).

**11.** *See generally* D.P. O'Connell, *State Succession in Municipal Law and International Law* (2 vols. 1967); D.P. O'Connell, *The Law of State Succession* (1956); Louis Henkin et al., *International Law* 286 (3d ed.1993); Restatement (Third) of Foreign Relations Law § 208, Reporters' Note 1.

be both tried and, if convicted, punished under a judicial and penal system not under the jurisdiction of the United Kingdom. Second, I am not persuaded by the panel's argument that refusing to certify Lui might cast aspersions on the rectitude of other near-reversion extraditions and thus "make extradition to Hong Kong ... the exception rather than the rule." Op. at 115 (quoting *Oen*, 858 F.2d at 1404). The implication would appear to be that this cannot be what the Senate intended. In view of the legislative considerations and determinations that I have outlined above, I do not believe that this court can speculate that the unavailability of extradition to Hong Kong in the circumstances of this case fails to uphold the Senate's expressed concerns and legislated intent. The US–UK extradition treaties do not just implicate Hong Kong; they are comprehensive agreements that encompass the United Kingdom and all the territories dependent upon it.[12] I cannot agree with the panel's implication that the district court's interpretation would have been a deal-breaker and the Senate would have refused to ratify the treaties if it had been told that their terms would be interpreted to prevent Lui's extradition in these circumstances. On the contrary, I believe that the district court was much nearer the mark when it concluded that "[i]t is clear beyond rational dispute that the Senate would not have ratified had there been any suggestion that the Treat[ies'] provisions could be extended, even by circumstance, to China." *Lui*, 957 F.Supp. at 1289.

To conclude, this court faces a situation that my research indicates has no truly analogous counterpart in the annals of modern international law. Because I do not believe that the panel's opinion reaches the correct result, and because I believe that the full court should hear and consider the numerous difficult legal questions that this case raises, I would grant the petition for en banc review.

For the foregoing reasons, I respectfully dissent from the denial of the petition.